## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VERONICA GREGORY, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> v.<br><br>MAPFRE U.S.A. CORP. and THE COMMERCE INSURANCE COMPANY,<br><br>     Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

Plaintiff Veronica Gregory ("Plaintiff") brings this Class Action Complaint, on behalf of herself and all others similarly situated, against Defendant MAPFRE U.S.A. Corp. (d/b/a MAPFRE Insurance) ("MAPFRE") and The Commerce Insurance Company ("Commerce") (and collectively with MAPFRE, "Defendants"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## NATURE OF THE CASE

1. Plaintiff brings this class action against Defendants for their: (i) failure to properly secure and safeguard highly valuable, protected personally identifiable information, including without limitation, Driver's License numbers ("PII"); (ii) failure to comply with industry standards to protect information systems that contain PII; and (iii) unlawful disclosure of Plaintiff's and Class Members' PII.

2.     Plaintiff seeks, among other things, damages and injunctive relief requiring Defendants to fully and accurately disclose the PII and other information that has been compromised and/or disclosed; to adopt reasonably sufficient security practices and safeguards to protect Plaintiff's and the Class's PII from unauthorized disclosures; and to prevent incidents like this disclosure from occurring again in the future.  Plaintiff further seeks injunctive relief requiring Defendants to provide identity theft protective services to Plaintiff and Class Members for three years, as Plaintiff and Class Members are at risk, and will continue to be at an increased risk of identity theft, due to the disclosure of their PII as a result of Defendants' conduct described herein.

3.     MAPFRE is a Fortune 500 company that provides insurance, including automotive and property policies, to over 30 million customers worldwide.

4.     MAPFRE employs an online instant auto insurance quote process, enabling individuals to quickly obtain an insurance quote from Defendants.

5.     To obtain an insurance quote online, users are directed to an online form, which asks for basic information about the individual, including their name, age, and email address.

6.     When users fill in their basic information, MAPFRE will auto-populate that form with the user's Driver's License number to provide users with their quote.

7.     Because of the systems MAPFRE utilizes, cybercriminals can use information they obtained independent of MAPFRE to fill in the form, which then provides cybercriminals with a person's Driver's License number.

8.     MAPFRE's systems may have also allowed it to intentionally disclose other information regarding what vehicle an individual owns, such as make, model, year, and vehicle identification number ("VIN").

9. By virtue of the way MAPFRE configured and designed its systems, MAPFRE intentionally disclosed the Driver's License numbers of its customers, and even non-customers, to cybercriminals.

10. Shortly thereafter, MAPFRE provided Plaintiff with a notice indicating that, between July 1, 2023 and July 2, 2023, an unidentified third party illegally used some of Plaintiff's information, including her name and date of birth, to obtain auto insurance quotes from MAPFRE's website, www.mapfreinsurance.com. The auto insurance quote MAPFRE provided to the cybercriminals disclosed Plaintiff's Driver's License number, and possibly more information regarding the vehicle she owns, to the unauthorized third party.

11. Defendants' policies and practices allowed unauthorized third parties to intentionally target and improperly obtain Plaintiff's and Class Members' PII through the use of MAPFRE's online insurance quote and/or policy process (the "Data Disclosure").

12. Indeed, MAPFRE intentionally configured and designed its online systems to auto-populate responses to form requests for insurance quotes with certain PII obtained from third-party data providers, including, but not limited to, Driver's License numbers, regardless of whether those requests are submitted by the individual to whom such information pertains. If not for MAPFRE's intentional configuration and design of its systems, it would not have disclosed Plaintiff's and Class Members' PII to cybercriminals.

13. The Data Disclosure was a direct and proximate result of MAPFRE's flawed online auto insurance quote system's configuration and design, which unnecessarily disclosed PII to anyone who submitted a request for an auto insurance quote, by way of its failure to verify users, and its failure to implement and follow basic security procedures, such as validating the identity of insurance applicants before disclosing their highly sensitive PII.

14.     Because MAPFRE essentially left its (cyber) door wide open for unauthorized users to access and pilfer individuals' PII, Plaintiff's and Class Members' PII is now in the hands of cybercriminals.

15.     As a result, Plaintiff and Class Members face substantially increased risk of future identity theft, both currently and for the indefinite future.  Plaintiff's and Class Members' PII, including their Driver's License numbers compromised by cybercriminals in the Data Disclosure, is highly valuable because it is readily useable to commit fraud and identity theft.

16.     Driver's License numbers can be used to file fraudulent unemployment claims, to open new accounts, take out loans in someone's name, or commit income tax refund fraud as several states require a Driver's License number for a tax return.  The cybercriminals who obtained Plaintiff's and Class Members' PII can use this information to commit a host of other financial crimes, including identity theft, and can sell this information to other cybercriminals who will do the same.

17.     Consequently, Plaintiff and Class Members have had to spend, and will continue to spend, significant time and money in the future to protect themselves due to Defendants' actions.

18.     Plaintiff, on behalf of herself and all others similarly situated, brings claims for negligence, negligence *per se*, violation of the Driver's Privacy Protection Act ("DPPA"), and declaratory judgment.

19.     Plaintiff seeks damages and injunctive relief requiring MAPFRE to adopt reasonably sufficient practices to safeguard the PII that remains in MAPFRE's custody in order to prevent incidents like the Data Disclosure from reoccurring in the future.  Given that information relating to the Data Disclosure, including the systems that were impacted, the configuration and design of MAFPRE's website, and the method of accessing PII in MAFPRE's insurance-quoting

process, remain exclusively in Defendants' control, Plaintiff anticipates additional support for her claims will be uncovered following a reasonable opportunity for discovery.

## PARTIES

20.     Plaintiff Veronica Gregory is a resident and citizen of the Commonwealth of Massachusetts.  Plaintiff received a data disclosure notice from Defendants informing her that Defendants disclosed her PII to unknown third parties without her authorization.

21.     Since the announcement of the Data Disclosure, Plaintiff has been required to spend her valuable time and resources monitoring her financial accounts, changing passwords, and contacting the credit bureaus about a credit freeze in an effort to detect and prevent misuse of her PII.  Plaintiff would not have to undergo such time-consuming efforts but for the Data Disclosure.

22.     As a result of the Data Disclosure, Plaintiff has been and will continue to be at heightened risk for fraud and identity theft, and its attendant damages, for years to come.  Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Disclosure.

23.     Defendant MAPFRE U.S.A Corp. is a Massachusetts corporation with its principal place of business in Webster, Massachusetts.

24.     Defendant Commerce is a Massachusetts corporation with its principal place of business in Webster, Massachusetts.  Commerce is a corporate subsidiary of MAPFRE responsible for underwriting automobile insurance policies sold and offered by MAPFRE.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 as it arises under the laws of the United States, including the Driver's Privacy Protection Act, 18 U.S.C. §2721, *et seq*.

26.     The Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) because the state law claims are related to claims in the action within such original jurisdiction and they form part of the same case or controversy under Article III of the United States Constitution.

27.     This Court has personal jurisdiction over Defendants because: (1) Defendants actively market their products and conduct substantial business in and throughout Massachusetts, where there are a considerable number of MAPFRE policyholders; (2) Defendants reside in the Commonwealth; and (3) the wrongful acts alleged in the Complaint, including MAPFRE's intentional disclosure of Plaintiff's Driver's License number caused harm to Plaintiff in Massachusetts.

28.     Venue is proper in this District, pursuant to 28 U.S.C. §1391(b)(2), because Defendants reside in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

### A.     MAPFRE and Its Instant Auto Insurance Quote Website

29.     MAPFRE offers "a wide range of insurance solutions for the home and vehicle"; is the 19th largest private passenger auto insurer; and does business in 12 states.[1]

30.     Under the framework that MAPFRE's website utilized before and during the Data Disclosure, individuals seeking an insurance quote from MAPFRE are only required to provide minimal information.  The remainder of the information needed to process the request is typically obtained from the relevant State's Department of Motor Vehicles ("DMV") or other third parties,

---

[1]      *Who We Are*, MAPFRE, https://www.mapfreinsurance.com/who-we-are/ (last visited Sept. 21, 2023).

such as insurers or data aggregators, who receive this information from state DMVs, and is auto-populated to MAPFRE's quote request form.

31.     MAPFRE's website, and the framework at issue in this litigation, was created by Defendants and was entirely under Defendants' control.

32.     This framework is by design.  MAPFRE, like other insurers, intentionally allows individuals requesting an auto insurance quote to provide only limited information.  This makes the process faster and less burdensome on the consumer, increasing the likelihood that they submit the application and thus increasing the number of requests for quotes that MAPFRE receives.  However, the expedited process and intentional design feature of MAPFRE's systems also makes it extremely ripe for exploitation and misuse by cybercriminals, such as what occurred to Plaintiff and Class Members during the Data Disclosure.

33.     Upon information and belief, if a user receives an auto insurance quote from MAPFRE, MAPFRE discloses the user's Driver's License number on the quote.

34.     However, this process of applying for an insurance quote is easily exploitable by cybercriminals and used by cybercriminals to obtain the PII of other individuals, such as Plaintiff and Class Members.

35.     For example, cybercriminals who possess only minimal and basic information of Plaintiff and Class Members – such as a name, address, and date of birth – can submit fraudulent requests for insurance quotes to obtain more detailed and sensitive PII from MAPFRE's systems, such as Driver's License numbers, which MAPFRE provides on the final insurance quote.  By repeating this process for multiple individuals, cybercriminals can develop a cache of highly sensitive personal information that they can then use to commit fraud or identity theft or sell on the dark web to other bad actors.

36.     Plaintiff and Class Members are entitled to security of their PII.  As an insurance company collecting and storing sensitive information, and as a DMV contractor with access to sensitive data such as Driver's License numbers, MAPFRE has a duty to ensure that such private, sensitive information is not disclosed or disseminated to unauthorized third parties.

**B.      MAPFRE Was on Notice that a Data Disclosure Was Likely**

37.     Defendants were on notice that the intentional design of their instant auto insurance quote process would leave them vulnerable to a cyberattack, such as the Data Disclosure.  Since the beginning of 2021, numerous insurance companies have suffered and/or reported data disclosures similar or identical to that suffered by Defendants:

- Metromile – disclosed the Driver's License numbers of approximately 120,000 individuals;

- Root Insurance Company – disclosed the Driver's License numbers, dates of birth, and vehicle information of approximately 73,000 individuals;

- Hagerty Insurance Agency – disclosed the Driver's License numbers, names, dates of birth, gender, address, and marital status of approximately 149,000 individuals;

- Farmers Insurance Exchange and 21st Century Insurance Company – disclosed the information of approximately 54,000 individuals;

- American Family Mutual Insurance Company – disclosed the Driver's License numbers of approximately 283,000 individuals;

- Noblr Reciprocal Exchange – disclosed the names and Driver's License numbers of approximately 97,000 individuals;

- GEICO—disclosed the Driver's License numbers of approximately 131,000 individuals;

- State Automobile Mutual Insurance Company – disclosed the names, Driver's License numbers, dates of birth, and gender of numerous individuals;

- Midvale Indemnity Company – disclosed the Driver's License numbers of numerous individuals;

- Alfa Insurance – disclosed the Social Security Numbers and Driver's License numbers of approximately 5,000 individuals;

- Infinity Insurance Company – disclosed the names, Driver's License numbers, addresses, and Social Security Numbers of numerous individuals.[2]

38.     Indeed, cyberattacks directed at insurance companies' instant online automobile insurance quote processes have become so commonplace that state regulators, such as the New York State Department of Financial Services, have warned insurance companies that not only have cybercriminals targeted websites that offer instant online automobile insurance premium quotes to steal unredacted Driver's License numbers, but cybercriminals have also offered to sell techniques and step-by-step instruction to access and steal Driver's License numbers from auto insurance websites.[3]

---

[2]     *Dissent*, *Despite an alert from NYS DFS, some insurance companies with "instant quote" portals were victimized*, (May 19, 2021), https://www.databreaches.net/despite-an-alert-from-nys-dfs-some-insurance-companies-with-instant-quote-portals-were-victimized/.

[3]     *Industry Letter*, Cybersecurity Division, New York Department of Financial Services (Feb. 16, 2021), https://www.dfs.ny.gov/industry_guidance/industry_letters/il20210216_cyber_fraud_alert.

39.     Despite the prevalence for which cybercriminals target instant online automobile insurance quote websites to steal sensitive PII, Defendants failed to employ adequate data security measures to safeguard their own instant online automobile insurance quote website.

40.     Organizations with reasonable and adequate cybersecurity will employ data security processes to protect their instant online automobile insurance quote websites from a cyberattack or unauthorized disclosure, including:

- avoiding the display of prefilled PII on public-facing websites;

- installing web application firewalls to protect against malicious attacks and exploitation of vulnerabilities by inspecting incoming traffic for suspicious activity;

- blocking the IP addresses of suspected unauthorized users;

- consider quote limits per user session;

- limiting user access to adjust, deface, or manipulate website content using web developer tools on public-facing websites;

- confirming that redaction and obfuscation of PII is implemented properly throughout the entire transmission of the PII until it reaches the public-facing website;

- implementing Completely Automated Public Turing Tests to tell Computers and Humans Apart ("CAPTCHA") to attempt to detect and block bots;

- improving internal access controls of agent portals that allow access to consumer PII by requiring robust passwords and limited login attempts;

- training employees and agents to identify social engineering attacks;

- ensuring that employees and agents only have access to sensitive information that is necessary to do their jobs;

- waiting until an eCheck, credit card, or debit card payment has been cleared by the issuing bank before generating an online policy and granting the policyholder access to PII; and

- ensuring that application programming interfaces (APIs) used to pull data files from data vendors are not directly accessible from the internet or agent portals.

41. Upon information and belief, Defendants failed to implement one or more of these standard data security measures to protect their auto insurance quote website from a cyberattack such as the Data Disclosure.

## C. The MAPFRE Data Disclosure

42. Shortly after the Data Breach, MAPFRE notified Plaintiff that an "an unknown party used information about you – which was already in the unknown party's possession – to obtain access to additional information about you through MAPFRE's Massachusetts online quoting platform in Massachusetts."[4]

43. Defendants' notice further explains that an "unknown party obtained access to your driver's license number through MAPFRE's Massachusetts online quoting platform" and that "[t]he unknown party may also have obtained access to information regarding vehicles you own, including make, model, year, and vehicle identification number."[5]

---

[4]     *Data Security Incident Report of MAPFRE Insurance: Notice Submitted to Persons*, MAPFRE (Aug. 22, 2023), https://www.mass.gov/doc/assigned-data-breach-number-30358-the-commerce-insurance-company-mapfre-insurancer/download.

[5]     *Id.*

44.     As these cybercriminals are in possession of the PII compromised in the Data Disclosure, Plaintiff and Class Members have been, and remain at, a certainly impending and imminent risk of fraud and identity theft.

**D.      MAPFRE Obtains, Collects, and Stores Plaintiff's and Class Members' PII**

45.     In the ordinary course of doing business as an automobile insurer, MAPFRE regularly requires its customers to provide their sensitive, personal, and protected information in order to register and use Defendants' services.

46.     Automobile insurers, such as MAPFRE, store and obtain additional personal information that they receive from other sources.  For instance, automobile insurers share claims information among themselves to help weed out consumers who switch to other providers.  These insurers also have access to a consumer's Driver's License number, current auto insurance policy data, and make and model of a consumer's vehicle(s).  Often, the information needed to process this request is typically obtained from the relevant state DMVs or other third parties, such as insurers or data aggregators, who receive this information from state DMVs.

47.     Automobile insurers, like MAPFRE, aim to make applying for an auto insurance policy as easy as possible to attract new customers.  To do so, automobile insurers like MAPFRE require only a minimal amount of information to apply for a policy.  The remainder of the information is filled in from data acquired from other sources.

48.     Cybercriminals employ a variety of techniques for obtaining this PII, including extracting data from the website's code, using web developer tools meant for debugging, and calling live agents with enough information to persuade them to hand over other forms of personal information, such as Driver's License numbers.  Indeed, the practice is so prominent there are "how-to guides" that aspiring criminals can buy that have appeared on cybercrime forums.

49.     Defendants did not have to configure or design their auto insurance quote systems in this way.  For example, instead of auto-populating insurance quote fields with highly sensitive PII, Defendants could have validated the user's information and processed the quote on the 'back-end' after receiving the applicant's information.  Nor was there a need for Defendants to disclose highly sensitive PII, like a purported quote applicant's Driver's License number, in response to a request for a quote.

50.     Defendants are in complete operation, control, and supervision of the MAPFRE website and systems, including the insurance quote portal.  Defendants intentionally configured and designed their website and systems this way because it helped to increase the number of quotes requested thereby benefiting their business, without regard to Plaintiff's and Class Members' PII which was disclosed to cybercriminals in the process due to the exploitability of Defendants' platform.

51.     By obtaining, using, disclosing, and deriving a benefit from Plaintiff's and Class Members' PII, MAPFRE assumed legal and equitable duties, and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

52.     Thus, MAPFRE had access to Plaintiff's and Class Members' PII, including their Driver's License numbers, which was stored in their systems, and intentionally disclosed to cybercriminals when generating a quote.

53.     Plaintiff and Class Members reasonably expect that insurance service providers such as Defendants will use the utmost care to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

54.     MAPFRE acknowledges that it has an obligation to protect consumers' PII from disclosure.  MAPFRE states in their Privacy Policy that they have "always made it a priority to protect your personal and privileged information"; that they "limit access to your personal and privileged information to those persons who need to know it to perform their jobs and to provide service to you"; that they "maintain physical and electronic safeguards to protect such information from unauthorized use or disclosure"; and that they "do not sell your information."[6]

55.     Though Plaintiff did not sign up for MAPFRE on her own, she was nonetheless an involuntary user of the platform once cybercriminals used information in their possession to fraudulently obtain insurance quotes, that then provided Plaintiff's PII, such as Driver's License number, to cybercriminals without authorization.  MAPFRE, therefore, owed Plaintiff the same duty to protect her PII as other, intentional, users.

56.     Despite Defendants' commitment to protecting personal information, MAPFRE failed to prioritize data and cybersecurity by adopting reasonable data and cybersecurity measures to prevent and detect the unauthorized access to Plaintiff's and Class Members' PII.

57.     Had MAPFRE remedied the security deficiencies, heeded advice from government regulators, followed industry guidelines, and adopted cybersecurity measures recommended by experts in the field, MAPFRE could have prevented intrusion into its information systems, and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

**E.      The Value of Private Information and Effects of Unauthorized Disclosure**

58.     MAPFRE understood the protected PII it acquires, stores, and utilizes is highly sensitive and of significant value to those who would use it for wrongful purposes.

---

[6]     *Privacy Policy*, MAPFRE, https://www.mapfreinsurance.com/privacy-policy/#:~:text=MAPFRE%20Insurance%20has%20always%20made,required%20or%20permitted%20by%20law (last visited Sept. 21, 2023).

59. MAPFRE also knew that a breach of its systems and exposure of the PII sorted therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

60. PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[7]

61. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes of identity theft, including medical and financial fraud.[8]

62. Driver's License numbers in particular – which were compromised as a result of the Data Disclosure – are highly sought after by cybercriminals on the dark web because they are unique to a specific individual and extremely sensitive. This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

63. Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here – unique Driver's License numbers – cannot be easily replaced.

64. The ramifications of Defendants' failure to keep Plaintiff's and Class Members' PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. According to the U.S. Government Accountability

---

[7] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[8] FTC Consumer Article, What To Know About Identity Theft, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited Sept. 21, 2021).

Office, which conducted a study regarding data breaches, "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[9]

65.     Thus, MAPFRE knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its systems were compromised.  MAPFRE failed, however, to take adequate cyber security measures to prevent the Data Disclosure from occurring.

## F.     FTC Guidelines and the DPPA

66.     MAPFRE is prohibited by the Federal Trade Commission Act, 15 U.S.C. §45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

67.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.  According to the FTC, the need for data security should be factored into all business decision-making in every department of a business.[10]

---

[9]     U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf.

[10]    *Start with Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Sept. 21, 2023).

68.     The FTC provided cybersecurity guidelines for businesses, advising, *inter alia*, that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[11]

69.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[12]

70.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, thereby treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

71.     Upon information and belief, Defendants failed to properly implement one or more of the basic data security practices recommended by the FTC. MAPFRE's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII, or to prevent the disclosure of such information to unauthorized individuals, as reflected by the sensitive Driver's License information provided in its response to requests for insurance quotes, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

---

[11]     *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Sept. 21, 2023).

[12]     *Id.*

72.     Defendants were at all times fully aware of their obligations to protect the PII of consumers because of their business of obtaining, collecting, and disclosing PII, as well as, collecting, storing, and using other confidential personal and financial information.  MAPFRE was also aware of the significant repercussions that would result from its failure to do so.

73.     The DPPA was enacted in 1994 in response to safety and privacy concerns stemming from the availability of personal information contained in state motor vehicle records. The DPPA was passed in the backdrop of the murder of actress Rebecca Schaeffer, whose murderer obtained her unlisted address through the California DMV.  Additional concerns were raised when witnesses testified in hearings before Congress regarding the privacy of DMV information of domestic violence victims and law enforcement officers, among other safety concerns surrounding driver information.  To address these concerns, the DPPA restricts the disclosure of personal information from motor vehicle records to certain permissible purposes expressly defined by the act.

74.     The unauthorized disclosures of information have long been seen as injurious. Common law alone can protect a person's right to prevent the dissemination of private information. Indeed, it has been said that the privacy torts have become well-ensconced in the fabric of American law.  And with privacy torts, improper dissemination of information can itself constitute a cognizable injury.  Because damages for a violation of an individual's privacy are a quintessential example of innumerable damages, such causes of action such as the DPPA provide privacy tort victims with a monetary award calculated without the need to measure actual damages.

75.     The DPPA states that "[a] State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: personal information, as defined in 18 U.S.C. §2725(3), about any individual

obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section." 18 U.S.C. §2721(a)(1).

76.     Defendants had an obligation to use reasonable security measures under the DPPA, which further states that "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." 18 U.S.C. 2722(a).

77.     Thus, the DPPA provides citizens with a private right of action in the event that their private information is knowingly obtained, disclosed, or used in a manner other than for the enumerated permissible purposes. The DPPA states, "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter [18 U.S.C. §§2721 *et seq*.] shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court." 18 U.S.C. §2724(a).

78.     The default rule under the DPPA is non-disclosure. The DPPA is structured such that 18 U.S.C. §2721(a)(1) and 18 U.S.C. §2722(a) provide the general prohibition on the release and use of motor vehicle information, and §2721(b) enumerates 14 specific exceptions to the general prohibition, none of which apply to the Data Disclosure described herein. Because the PII was disclosed to unauthorized individuals – *i.e*., cybercriminals – there is no argument to be made that disclosure was "for a permissible purpose."

**G.     Plaintiff and Class Members Suffered Damages**

79.     For the reasons mentioned above, Defendants' conduct, which allowed the Data Disclosure to occur, caused Plaintiff and Class Members significant injuries and harm in several ways, including a substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor credit and

19

financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services and pay to procure them.

80. The ramifications of MAPFRE's failure to keep PII secure are long-lasting and severe. Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendants' conduct. Further, the value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Disclosure.

81. As a result of Defendants' failures, Plaintiff and Class Members now face a substantial and imminent risk of identity theft and fraud as a result of the Data Disclosure. Unauthorized individuals carried out the Data Disclosure and stole the personal information of Plaintiff and Class Members with the intent to use it for fraudulent purposes and/or sell it to other cybercriminals.

82. The risk of identity theft is particularly substantial when the PII compromised, in this instance Driver's License numbers, is unique to a specific individual and extremely sensitive.

83. Plaintiff and Class Members have already spent and will spend substantial amounts of time monitoring their accounts for identity theft and fraud, and reviewing their financial affairs more closely than they otherwise would have done but for the Data Disclosure. These efforts are burdensome and time-consuming.

84.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records and credit monitoring.  Plaintiff and the Class are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

85.     Further, many Class Members will incur out-of-pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs stemming from the Data Disclosure.

86.     Despite the publicly available knowledge of the continued compromises of PII and the importance of securing such information, MAPFRE's commitment to privacy fell by the wayside.  Rather than protect Plaintiff's and Class Members' PII, MAPFRE ignored these risks and knowingly configured and designed its systems in a way that disclosed this information to cybercriminals.

87.     As an auto insurance company that handles personal information containing Driver's License numbers as part of its ordinary business model, MAPFRE was well aware of the requirements and purpose of the DPPA.

88.     As an entity that receives information obtained from state DMVs, MAPFRE was well-informed that the PII it collected was highly sensitive, and that disclosure of that information to the public by, for example, storing it on systems accessible to the whole internet, would violate the DPPA.

89.     Critically, only Defendants had control over the configuration and design of their own systems, and knowingly chose to forego necessary data protection, to secure Plaintiff's and Class Members' PII.

90.     Despite the clear dangers that the unsecure use of PII poses, Defendants knowingly chose to configure and design their systems to disclose Plaintiff's and Class Members' PII to unauthorized third parties.

91.     As a result of MAPFRE's failure to prevent the Data Disclosure, Plaintiff and Class Members have suffered and will continue to suffer injuries, including loss of time and productivity through efforts to mitigate and deal with the future consequences of the Data Disclosure; theft of their valuable PII; the actual, imminent, and certainly impending injury flowing from fraud and identity theft posed by their PII being placed in the hands of cybercriminals; damages to and diminution in the value of their PII; and continued risk to Plaintiff's and Class Members' PII, which remains in the possession of Defendants and which is subject to further disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII that was entrusted to them.

## CLASS ALLEGATIONS

92.     Plaintiff brings this case individually, and on behalf of the following nationwide class pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All individuals in the United States whose PII was disclosed by MAPFRE to unauthorized third parties during the Data Disclosure.

93.     Excluded from the Class are Defendants, their subsidiaries and affiliates, their officers, directors, and members of their immediate families, any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, and the judicial officer(s) to whom this action is assigned and the members of their immediate families.

94.     Plaintiff reserves the right to modify or amend the definition of the proposed Class, if necessary, before this Court determines whether certification is appropriate.

95.     **Numerosity**.  The members of the Class are so numerous that the joinder of all members is impractical.  Plaintiff is informed and believes, and thereon alleges, that there are at minimum, thousands of members of the Class described above.  The exact size of the Class and the identities of the individual members are identifiable through Defendants' records, including, but not limited to, the files implicated in the Data Disclosure, but based on public information, the Class includes approximately 200,000 individuals.

96.     **Commonality**.  The requirements of Rule 23(a)(2) are satisfied.  There is a well-defined community of interest and there are common questions of fact and law shared by the Class Members.  The questions of fact and law common to the Class predominate over questions which may affect individual members and include the following:

    a.      whether and to what extent Defendants had a duty to protect the PII of Plaintiff and Class Members;

    b.      whether Defendants were negligent in collecting and disclosing Plaintiff's and Class Members' PII;

    c.      whether Defendants had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

    d.      whether Defendants took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

    e.      whether Defendants failed to adequately safeguard the PII of Plaintiff and Class Members;

    f.      whether Defendants breached their duties to exercise reasonable care in handling Plaintiff's and Class Members' PII by disclosing that information on insurance quotes in the manner alleged herein, including failing to comply with industry standards;

g.      whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Disclosure;

h.      whether Defendants had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

i.      whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

j.      whether Defendants violated 18 U.S.C. §2721, *et seq.*, by disclosing Plaintiff's and Class Members' PII;

k.      whether Plaintiff and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and

l.      whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm they face as a result of the Data Disclosure.

97.      **Typicality**.  The requirements of Rule 23(a)(3) are satisfied.  Plaintiff's claims are typical of the claims of Class Members.  The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendants to safeguard PII.  Plaintiff and Class Members each had their PII disclosed by MAPFRE to an unauthorized third party.

98.      **Adequacy**.  The requirements of Rule 23(a)(4) are satisfied.  Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class Members.  Plaintiff will fairly, adequately, and vigorously represent and protect the interests of Class Members and has no interests that are antagonistic to the Class Members.  In addition,

Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation.

99.     **Superiority**.   This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable.  The claims of Plaintiff and Class Members are substantially identical as explained above.  While the aggregate damages that may be awarded to the Class Members are likely to be substantial, the damages suffered by the individual Class Members are relatively small.  As a result, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for the wrongs done to them.  Certifying the case as a class will centralize these substantially identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiff and the Class and will conserve the resources of the parties and the court system, while protecting the rights of each member of the Class.

100.    **Predominance**.   Common questions of law and fact predominate over any questions affecting only individual Class Members.  Similar or identical violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.  For example, Defendants' liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendants breached their duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

101.    **Injunctive Relief**.   Defendants' uniform conduct is generally applicable to the Class as a whole, making relief appropriate with respect to each Class member.

102.    **Ascertainability**.  Class Members are ascertainable.  Class membership is defined using objective criteria and Class Members may be readily identified through Defendants' records.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(Plaintiff Individually and on Behalf of the Class)**

103.    Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

104.    MAPFRE owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII kept in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

105.    More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendants' systems, including their website, to ensure that Plaintiff's and Class Members' PII kept in Defendants' possession was adequately secured and protected; (b) implementing processes that would detect a breach of their security systems in a timely manner; (c) timely acting upon warning and alerts, including those generated by their own security systems, regarding intrusions to their networks; (d) maintaining data security measures consistent with industry standards; and (e) ensuring that their systems did not disclose Plaintiff's or Class Members' PII to unauthorized third parties other than themselves who fraudulently submitted requests for insurance quotes.

106.    Defendants' duty to use reasonable care arose from several sources, including, but not limited to, those described below.

107.    Defendants had a common law duty to prevent foreseeable harm to others.  This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendants.  By collecting and disclosing valuable PII that is routinely targeted by cybercriminals for unauthorized access, Defendants were obligated to act with reasonable care to protect against these foreseeable threats.

108.    Defendants acknowledge that they have a duty to protect consumer data.  *See* ¶54, *supra*.

109.    Defendants had a duty not to engage in conduct that creates a foreseeable risk of harm to Plaintiff and Class Members.

110.    Defendants' duty also arose from various statutes requiring Defendants to implement reasonable data security measures to protect and not disclose PII, including, but not limited to, Section 5 of the FTC Act and the DPPA.

111.    Defendants breached the duties owed to Plaintiff and Class Members and thus were negligent.  Specifically, Defendants breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff and Class Members; (b) detect the breach while it was ongoing; and (c) maintain security systems consistent with industry standards.

112.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, their PII would not have been compromised.

113.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including:

        a.    theft of their PII;

        b.    diminution in value of their PII;

    c.       costs associated with requested credit freezes;

    d.       costs associated with the detection and prevention of identity theft;

    e.       costs associated with purchasing credit monitoring, and identity theft protection services;

    f.       lowered credit scores resulting from credit inquiries following fraudulent activities;

    g.       costs associated with time spent and the loss of productivity from taking time to address and attempt to mitigate and deal with the actual and future consequences of the Data Disclosure;

    h.       the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

    i.       damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendants with the reasonable understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

    j.       continued risk of exposure to hackers and thieves of their PII, which remains in Defendants' possession and is subject to further disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

114.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT II
### VIOLATION OF 18 U.S.C. §2721, *et seq.* (DPPA)
### (Plaintiff Individually and on Behalf of the Class)

115.    Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

116.    Pursuant to 18 U.S.C. §2722(a), "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title."

117.    Pursuant to 18 U.S.C. §2721(a)(1), "[a] State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section."

118.    The DPPA provides a civil cause of action against "a person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted" under the statute.  18 U.S.C. §2724(a).

119.    "Person" is defined as "an individual, organization or entity."  18 U.S.C. §2725(2). Accordingly, Defendants are "persons" under the DPPA.

120.    "Personal information" is defined as "information that identifies an individual, including an individual's . . . driver identification number. . ."  18 U.S.C.  2725(3).  Accordingly, Plaintiff's and Class Members' PII, which includes Driver's License numbers, is "personal information" under the DPPA.

121.    "Motor vehicle record" is defined as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a

department of motor vehicles." 18 U.S.C. §2725(1). Accordingly, Defendants obtain motor vehicle records containing Plaintiff's and Class Members' PII, including their Driver's License numbers.

122. Defendants obtain motor vehicle records as part of their online insurance quote and/or policy process.

123. Defendants' disclosure of Plaintiff's and Class Members' personal information to unauthorized individuals violated 18 U.S.C. §§2722(a) and/or 2721(a)(1).

124. Defendants' disclosure of personal information was not a permitted use under 18 U.S.C. §2721(b).

125. Defendants knowingly obtained and/or disclosed Plaintiff's and Class Members' personal information, which came from a motor vehicle record, for a purpose not permitted under the DPPA.

126. Defendants knowingly and voluntarily configured and designed their insurance quote application portal to disclose Plaintiff's and Class Members' PII to anyone who requested an insurance quote in direct violation of the DPPA.

127. Defendants installed no protections or security measures to protect this exposed information and willfully disclosed it to cybercriminals through the intentional configuration and design of its insurance quote application portal.

128. Alternatively, Defendants had constructive notice that they had disclosed the PII of Plaintiff and Class Members to unauthorized third parties, because they should have been aware that configuring and designing their website to disclose Plaintiff's and Class Members' PII to anyone who submitted a request for a quote without authentication or other security protections would cause the disclosure of this information.

129.    Defendants were also on notice that cybercriminals were exploiting cybersecurity flaws on websites which offer instant online automobile insurance premium quotes by stealing nonpublic information, including Driver's License numbers.

130.    At a minimum, Defendants were willfully ignorant that their website and servers were configured and designed without any protections to store Plaintiff's and Class Members' PII and would disclose that personal information to cybercriminals upon request of an instant automobile insurance premium quote.

131.    Merriam-Webster's dictionary defines "disclose" as "to make known or public," "to expose to view," or, alternatively, "to open up."  None of these definitions requires an identified intended recipient. Instead, disclosure is the act of exposure.  Whether Defendants meant for identifiable third parties to access Plaintiff's and Class Members' PII is not relevant.  All that is required for a knowing disclosure is a voluntary action.

132.    Pursuant to 18 U.S.C. §2724(b)(1)-(4), Plaintiff seeks, on behalf of herself and members of the Class: (1) actual damages, not less than the statutory liquidated damages in the amount of $2,500; (2) punitive damages; (3) reasonable attorneys' fees and costs; and (4) preliminary and equitable relief as the Court deems appropriate.

## COUNT III
## DECLARATORY JUDGMENT
### (Plaintiff Individually and on Behalf of the Class)

133.    Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

134.    Under the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal remedies of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as those

alleged herein, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

135.    An actual controversy has arisen in the wake of the Data Disclosure regarding Plaintiff's and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII.  Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

136.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendants owe a legal duty to secure consumers' PII under the common law, Section 5 of the FTC Act, and the DPPA; and

b.    Defendants continue to breach this legal duty by failing to employ reasonable measures to secure consumers' PII.

137.    This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

138.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data disclosure from MAPFRE.  The risk of another such breach is real, imminent, and substantial.  If another breach at MAPFRE occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable and they will be forced to bring multiple lawsuits to rectify the same conduct.

139.    The hardship to Plaintiff and the Class if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued.  Plaintiff and the Class will likely be subjected to substantial identity theft and other damages.  On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants already have a pre-existing legal obligation to employ such measures.

140.    Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data disclosure from MAPFRE, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of herself and all others similarly situated, pray for relief as follows:

a.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

c.    For damages in an amount to be determined by the trier of fact;

d.    For an order of restitution and all other forms of equitable monetary relief;

e.    Declaratory and injunctive relief as described herein;

f.    Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

g.    Awarding pre- and post-judgment interest on any amounts awarded; and

h.       Awarding such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

A jury trial is demanded on all claims so triable.

Dated: September 28, 2023                    Respectfully submitted,

*/s/      Joseph P. Guglielmo*
Joseph P. Guglielmo (Bar No. 671410)
Amanda M. Rolon (*pro hac vice forthcoming*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
jguglielmo@scott-scott.com
arolon@scott-scott.com

*Counsel for Plaintiff*